Matter of W.N. (2005 NY Slip Op 50723(U))

[*1]

Matter of W.N.

2005 NY Slip Op 50723(U)

Decided on April 7, 2005

Family Court, Onondaga County

Hanuszczak, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 7, 2005

Family Court, Onondaga County
In the Matter of W.N. and J.N.
B-03XXX-03XXX-03

Onondaga County Department of Law (Joseph Zavaglia, of counsel), Syracuse, for petitioner. James Corl, Jr., Esq. Syracuse, , for respondent. P. Scott Micho, Esq.Syracuse, for respondent. Michael Marmor, Esq., Syracuse, Law Guardian.

Michael L. Hanuszczak, J.
The children who are the subjects of this termination of parental rights proceeding are W. N., born on July 14, 1999, and J. N., born on July 5, 2001. The respondents are married to one another and are the parents of the subject children.
On September 4, 2001, the subject children were removed from their home on an emergency basis, pursuant to Section 1024 of the Family Court Act, after two-month-old J. was hospitalized and diagnosed with injuries including multiple healing rib fractures, fractured right humerus, fractured left humerus, torn frenulum, numerous mouth ulcers, and multiple facial bruises at various stages of healing. The medical records indicated that two-month-old J.'s injuries were inflicted over an extended period of time.
On September 6, 2001, the Court entered an Order Directing Temporary Removal and placed the children in the custody of the Commissioner of Social Services. On January 24, 2002, by an Order of Fact Finding and Disposition and Permanency Hearing, the Court adjudged that W. N. was neglected and abused by the mother and the father and that J. N. was neglected and abused by the mother and the father based on stipulated medical evidence and the admission of the respondent-father that he had inflicted the injuries upon J. N. and the admission of the respondent-mother that she misused cocaine, alcohol, and marijuana during her pregnancy with J. and allowed the respondent-father to be the sole caretaker for the children for extended periods of time in her absence from the residence. The respondents waived a dispositional hearing and the Court ordered the children to be placed in the custody of the Commissioner of Social Services and ordered the respondents to be placed under the supervision of the Department of Social Services with specific terms and conditions listed in the Order, with reunification with the parents as the permanency plan goal. The Order of Protection ordered the respondent-father to have no contact with the children until he petitioned for approval by the Department of Social Services and ordered the respondent-mother to have no unsupervised contact with the children. On consent of the parties, the Order extending placement and supervision and the Order of Protection have been extended.
On April 10, 2003, the petitioner-Department of Social Services filed a petition seeking [*2]to terminate the rights of the respondent-mother based upon permanent neglect and of the respondent-father based upon abandonment of the children. The respondents were personally served with a summons and copy of the petition. Testimony was presented in the fact-finding portion of the proceeding at eleven Court sessions; the fact-finding phase of the proceeding was lengthened by the amount of evidence, three adjournments granted due to attorney illness or family emergency, the schedules of the attorneys involved, and the heavy caseload of the Court.
ABANDONMENT
The petition alleges that the respondent-father (the "father") has abandoned the children in that he made no attempt to communicate with the Department of Social Services during the six-
month period immediately preceding the date of the filing of the petition, i.e., October 10, 2002 until April 10, 2003.
Standard of Law
A finding of abandonment is appropriate when there is clear and convincing evidence that the parent evinces an intent to forego his or her parental rights during the six-month period prior to the filing date of the petition by failure to visit or communicate with the child or the agency having custody of the child, although able to do so and not prevented or discouraged from doing so by that agency. (Social Services Law §§ 384-b [3] [g], [4] [b], [5])
Fact Finding
The Department of Social Services caseworker (the "caseworker") testified that she had no communication whatsoever with the father from September 16, 2001 until January 9, 2003 when she approached him in a Courthouse waiting room prior to a Court appearance for an extension order. According to the caseworker, at that time they discussed the father's release date from his five-to-seven-year prison sentence, the progress of the children in foster care, and the programs that the father attended while incarcerated, including domestic violence seminars, alternatives to aggression, and rehabilitation. The caseworker testified that, after the January 9, 2003 conversation, she sent a letter to the father asking him to provide verification of any programs that he completed while in prison, but she received no response to that letter.
In February, 2003, the caseworker testified that she received a letter from the father asking about the children's progress and indicating that he would like to write them. In response, the caseworker sent a letter to the father in February, 2003 updating the father on his children, instructing him to mail all communications to her [the caseworker] and she would send the mail to the children. The caseworker testified that she enclosed pictures of the children in her responding letter.
The caseworker also testified that she received a letter from the father on March 27, 2003 asking why she had never contacted him and inquiring as to the status of a home study evaluation of the father's sister in Virginia. The caseworker responded to this letter on April 2, 2003 addressing his concern that she had not contacted him prior to his letter since she did not know where he was located and explaining that the home study of his sister was begun at the time of the children's placement but not completed until after it became apparent to the agency that the children would not be returned to their home. The caseworker testified that she had no other communication from the father.
The father testified that he wrote "a couple" of letters to the caseworker, later amending that to three or four, and then changing that to seven letters. He did not provide dates that the letters were [*3]sent. He stated, "I'm not a computer, nor the Post Office; ask her what she did with the letters." He also testified that he contacted the caseworker when he arrived at the Elmira Processing Center. He did not testify that he contacted the caseworker after he was transferred to the Mid-State Correctional Facility, where he is now incarcerated.
The father admitted that he received a letter from the caseworker informing him that he could send letters for the children to the caseworker and that she would convey them to the children. He also admitted that he did not ever send any letters to the children, stating that he did not trust the caseworker: "Why would I want to talk to a woman who didn't care about W. N. [omission] or anything about him being reunited with his children because I'm sitting in jail." and "I know who the devil is too, but I don't write him."
The father also testified that on December 10, 2002, he wrote to the Family Court Clerk for forms so as to petition for temporary custody of the children on behalf of his mother and his sister; he also requested a form to appeal "a[n] application for permanency hearing..." On December 10, 2002, the father also wrote a letter to the presiding Judge which was provided to the father's
attorney. On February 5, 2003, the father filed a petition with the Family Court seeking to modify the Order of Protection; this petition was withdrawn on August 25, 2003.
Analysis
An examination of the documents which the father sent to or filed with the court and which were received into evidence, shows that all three of the documents express his concern that custody of the children be granted to his family in Virginia. The father's consistent wish that his mother or sister be granted custody of the children may even be construed as intent to forego his parental rights. In his December 10, 2002, four-page letter to the Court, the father never indicates that he misses or loves the children; the only reference that can possibly be taken to mean that he wants to maintain a relationship with them is his two-line statement that he has filed a petition for visitation. Indeed, the letter as a whole exhibits anger at the Court and anger at the Department of Social Services.
The December 10, 2002 letter to the Family Court Clerk merely asks for forms for a custody petition for his relatives and for an appeal of an order for a permanency hearing.
In the father's Petition to Modify an Order of Family Court, filed on February 5, 2003, he seeks to modify the Order of Protection prohibiting him from contacting the children. He asks for visitation once a month and, once again, wants the Court to order a home study of his mother and sister.
Based on the evidence, the father did not contact the caseworker until after she approached him prior to a January 9, 2003 Court session. After that time, the evidence shows that the father sent two letters to the caseworker; in the first letter he asked about his children and in the second he asked why the caseworker had never contacted him and also wanted information on the status of a home study involving his relatives.
The father blames the agency for not contacting him and for not setting up services for him while he is incarcerated. His argument is unavailing since the agency is not required to contact him or to make diligent efforts to return the children when he has not kept them informed of his location. (Social Services Law § 384-b [5] [b]) (Matter of Christine F., 147 AD2d 980) Indeed, the onus is on the father to maintain the parental relationship. In this case the father had a duty to contact the agency as the legal custodian of the children, even though he was incarcerated. (Matter of Ariel C., [*4]248 AD2d 976) The father's attorney argued that the father attempted to check on the children through his family. Even if this were true, the father's statements concerning the interest shown in the children by his relatives are no evidence of intent on his part not to forego his parental rights. (Matter of Thomas G. Jr., 165 AD2d 729; Matter of Starr L.B., 130 Misc2d 599)
The father argues that he thought that he was required to modify the Order of Protection in order to have contact with the children and that he did file a petition for modification. He stated that he had to wait until he could consult a law library to find out what to do, mentioning that he took a law course while he was incarcerated. He also stated that he waited to file his modification petition until after he knew that the mother was not successful in her completion of a drug rehabilitation program. This statement contradicts testimony in which he stated that he knew the mother would not be successful in overcoming her drug addiction. Taken as a whole, the evidence fails to prove that the father was uncounseled or confused, and there is absolutely no evidence that he ever asked the agency what his rights and responsibilities were. (Matter of Gabrielle HH., 760 NYS2d 269.) The Court has had the unique opportunity to observe the demeanor of the witnesses as an aspect of their credibility and notes that, during his testimony, the father displayed a sarcastic and combative attitude, requiring the Court to admonish him on several occasions. On many occasions he cut off the examiner before the question could be articulated, on several occasions he refused to answer questions which were put to him and, once, he invoked the Fifth Amendment. Although the father's attorney characterized the cross-examination of his client as "vicious," this Court does not agree. Rather the father's hostility to cross-examiners was apparent from his answers, including: "I was here; were you?" and "I read the same law books you do." On the important point of how often he had written the caseworker, the father changed his testimony several times. Finally, he stated, "It's immaterial how many letters I wrote to the caseworker. " The father made a poor impression on the Court; his testimony is found to be less than credible and, indeed, totally lacking in credibility as to the amount of correspondence he claims to have sent to the caseworker. In contrast, the Court finds the extensive testimony of the caseworker very credible and reliable.
In his direct examination, the father stated that the injury to two-month-old J. was an "accident." He also volunteered the information that he was convicted of Assault in the Second Degree due to the injuries he inflicted on J. It is noteworthy to compare the father's version of J.'s injuries while he was questioned on direct examination to the version which he attested to in his Voluntary Affidavit, which was signed on September 4, 2001 and which was received into evidence in the instant proceeding.
During direct examination, the father stated that he was stressed from being the primary caretaker for the two children because the mother left him alone with the children. He further testified that he was frustrated in gaining access to public assistance programs. A telephone call to his mother and sister in Virginia did not yield the expected results they told him to "hang in there" and they would come to visit him on the next Friday. The father testified that he was "upset" because he wanted to hear a different response from his relatives. The father stated that he had $1.39 in his pocket and he used it to purchase a forty-ounce container of beer. Once home, he took three drinks of the beer and then awoke lying upon the floor on top of J. He did not think that she was injured until later, about 5:30 or 6:00 in the morning, when she appeared "fussy." Since he did not have a telephone, the father testified that he waited until a neighbor awoke and then he used the telephone to call his sister-in-law. When the sister-in-law arrived at 9:30 a.m., he took J. to a health [*5]center, where he was then directed to take J. to the emergency room. The father testified that J.'s injury was an accident: "One accident doesn't mean because you had an accident that you should forego any right you have to everything." The father did not make any statement of remorse for J.'s injuries during his testimony.
In contrast, the father's Voluntary Affidavit, sworn to on September 4, 2001, states that he "yanked" J. up by her left arm from her bassinet at about 2:00 a.m. and felt something break. The father stated that he grabbed J.'s face because she was crying, causing bruising. He stated that three to four weeks prior, he picked J. up, put her in front of his face, and squeezed her "probably a little to [sic] hard" around her "belly." He further stated that he thought this might have caused J.'s broken ribs. Sometimes, the father continued, he "shoved" the bottle or pacifier into her mouth just to shut her up; he also burped her "harder than I should of." The father stated he "smacked" J. on both sides of her face with an open hand and his wedding ring may have caused a bruise on her face. The father also stated that he dropped or tossed J. into her bassinet two or three times over the last two days such that he could see her bounce when she hit the pad. The father stated that he was "very sorry" about what he did to J.
On cross-examination, the father admitted that the physician informed him that J. had old injuries as well as the fractured arm. He had no explanation as to what had caused the old injuries.
This Court has no doubt that J.'s injuries were inflicted by the father over a period of several weeks. These injuries were no accident. The father's attempt to revise his account of how J. was hurt is not believable; it also reflects extremely poorly on the father's insight into his own problems. He ignored or minimalized any responsibility for his own actions and shifted the blame on others; in fact, this is a pattern of behavior that becomes evident throughout the father's testimony.
In summation, the Law Guardian argued insightfully that the father abandoned the children since he never sent or attempted to send one letter, card, or gift to the children even though he knew he could send such things to the caseworker. The Law Guardian noted that the father had the ability to contact the agency and the children since he was bright, articulate, reads and speaks English very well, had access to counselors while incarcerated, and even took a course in the law while in prison. The Law Guardian characterized the father's letters to the Court as "self-serving" attempts to further his own purpose and interest. He also asserted that the father refused to take responsibility for anything that has happened.
Findings of Fact and Conclusions of Law
The evidence shows that in the six months prior to the filing of the instant petition, the father made only one contact to the agency that included a request for information about the children. Sporadic and isolated efforts at maintaining contact with the children do not preclude a finding of abandonment. (Matter of Charles U., 254 AD2d 588; Chantelle TT., 281 AD2d 660; Matter of Ronald D., 282 AD2d 533) The statute presumes the parent's ability to visit and communicate with the child and the parent's subjective intent, unsupported by objective evidence, does not preclude a finding of abandonment. (Social Services Law § 384-b [5] [b]) The burden of proof lies with the parent to justify his or her lack of contact. (Matter of Ulysses T. Jr., 87 AD2d 998)
In the instant proceeding, the father did not allege or prove that he was unable to maintain contact with the caseworker because the caseworker prevented him or discouraged him from doing so. (Matter of June D. S., 288 AD2d 904) The evidence shows that the father never sent a card, letter, or gift to either of the children through the agency while they were in foster care. It is difficult [*6]for this Court to believe that the father was unable to accumulate even the price of a birthday card for his children. The father argues that the Order of Protection prohibited him from contacting his children and that no one told him to contact the Department of Social Services. However, he admitted that he knew the children were in the custody of the Department of Social Services and housed in a foster care home. He admitted that he knew how to contact the agency and that on February 20, 2003 the caseworker had written him that he could send letters to her and that she would forward them to the children. The father had no credible explanation of why he never wrote
any letters to the children after he received the February 20, 2003 letter; his excuse that he did not trust the caseworker is not acceptable.
In the context of the other evidence in this proceeding and, taking into consideration the father's demeanor and attitude, this Court finds that the father's petition for modification of the Order of Protection was filed for the purpose of defeating the presumption of abandonment rather than a sincere desire to maintain a parental relationship with the children. (Matter of Cody Michael B., 258 AD2d 421; In re Anthony M., 195 AD2d 315)
Indeed, the evidence shows that the father has failed to articulate any love for the children. Neither in his contacts with the Department of Social Services, nor in his petition for modification of the Order of Protection which he withdrew, nor in his testimony does the father show any glimmer of parental feeling. When asked why he wants the children returned, the father answered, "Because I was born and raised to take care of your responsibility."
This father has absolutely no relationship with the children and that is solely due to his own actions and inactions.
Accordingly, for all of the reasons stated herein, this Court finds by clear and convincing evidence that the petitioner has sustained its cause of action for abandonment against the father and, as a dispositional hearing is not required, the father's parental rights are terminated.(Matter of June D.S., 288 AD2d 904, supra )
PERMANENT NEGLECT
The petition alleges that the respondent-mother (the "mother") permanently neglected the children in that she has failed for a period of more than one year following the date the children
came into foster care to maintain contact with or plan for the future of the children. The applicable time period is September 5, 2001 through November 25, 2002.
Fact Finding
During the fact-finding hearing, the attorney for the mother stipulated that the mother had not completed drug rehabilitation for her cocaine addiction. There was very reliable testimony by the caseworker that the mother failed to complete a drug rehabilitation program although she had been enrolled in four programs of her own choice during the period prior to the filing of the termination of parental rights petition. The caseworker testified that the mother either left or was dismissed from each of the programs prior to its completion for failure to attend and/or to follow recommendations and that the mother admitted to the caseworker on two occasions that she was still using drugs. There was also very credible testimony by the caseworker and the parent aide that the mother refused to cooperate with the mental health counseling component of her rehabilitation program even though she had been identified as depressed and bi-polar. According to the parent aide, on at least two occasions, the mother stated that she did not need treatment. On or about May 15, 2002, after informing the parent aide that she wanted to hurt herself, the mother was briefly [*7]hospitalized on an emergency basis; thereafter, the mother admitted to the parent aide that she had relapsed and was using crack cocaine.
The caseworker further testified that the mother failed to obtain suitable housing in that the mother stated that she was living at various addresses at varying times, but the caseworker could not find the mother at those addresses. In 2002, for a period of time the mother moved into her own mother's residence and was having unsupervised visits there with her children. However, in April 2002, the mother began missing visits and was not to be found at the residence. After several missed visits and difficulty contacting the mother, the caseworker resumed supervised visits between the children and the mother. This period coincided with the mother's voluntary termination of her second drug rehabilitation program. The caseworker testified that she had discussions with the mother about services and the mother's lack of progress on at least eight occasions between November 2001 and May 2002. It was the caseworker's opinion that the mother understood the need for services and the consequences should she not progress in services.
The parent aide testified that the mother attended forty-six out of fifty-two arranged visits with her children but failed to make progress in several goals, including health maintenance, personal finance, and consistency in attending appointments and meetings. The parent aide testified that the mother attended the children's medical appointments at first but then ceased attending in May 2002. The parent aide also testified that, at first, the mother demonstrated little interaction with the younger child J. during the visits. After working with the parent aide on this issue, the mother appeared to make progress in her relationship with J.
The parent aide testified that the mother attended only one of the scheduled appointments for treatment of her diabetes in two years and failed to follow the medical recommendations for her diet, even though the mother told the parent aide that testing revealed that she was on the verge of a diabetic coma and she was experiencing dizziness and light-headedness. The parent aide was unsure if the mother was taking her prescribed medication for diabetes and depression. The parent aide also testified of conversations between herself and the mother about the importance of keeping medical appointments and the mother's excuses for her non-attendance at those appointments: sometimes she overslept; sometimes she did not want to go; sometimes she had stayed up all night; sometimes she allegedly had gone somewhere else to help someone. The parent aide also testified that the
mother informed her that she used alcohol on or about September 30, 2002 while she was in a recovery program.
The Alliance community services coordinator testified that the mother did not complete a parenting skills course or structured learning therapy course until after the termination petition was filed. It was her opinion that even though the mother completed the course, she failed to apply the lessons in her daily life. The Alliance coordinator testified that the mother attended some Alliance progress meetings to discuss her services and her progress with services with the team of service providers but refused to attend all of the meetings. The Alliance coordinator also testified that the
mother received assistance from an individual support person, regarding transportation, housing, and substance abuse issues, although that service was terminated due to the mother's noncompliance.
Notably, the caseworker, the parent aide, and the Alliance coordinator all testified that the children would not be safe if they were returned to the mother.
After four days of testimony, the mother failed to appear for the fifth day of fact finding. The mother's attorney stated that she was ill, and the Court asked the attorney to inform the mother [*8]that a medical excuse would be required. The mother's attorney participated in that day's Court session, cross-examining the witness and making a motion to dismiss after the petitioner rested its case. On the next day of trial, the mother again failed to appear, and her attorney stated that he had been in contact with her and the mother stated that she could not come to Court since she did not have a ride or the money for local bus fare. The mother's attorney moved the Court for permission to withdraw as the mother was not cooperating with her own defense, and the attorney was relieved after there were no objections from the other attorneys. The petitioner then moved the Court for a finding of default on the mother, which the Court granted, effective that day. The fact-finding phase of the proceeding resumed with the respondent-father presenting his defense.
Prior to rendering a decision on the fact-finding phase of the proceeding, the Court determined sua sponte that the permissive withdrawal of counsel for the mother was ineffective due to the non-notification of the mother and that the finding of default was void. The mother's attorney was presented with transcripts of the Court sessions at which the attorney was absent and invited to examine the exhibit file. The fact-finding phase of the proceeding was reopened at a later date for the purpose of permitting the mother to present a defense. The mother's attorney was also given the opportunity to cross-examine the father, who was the sole witness who testified during the attorney's absence from the Court proceedings.
At the continuation of the fact-finding portion of the trial, the mother testified on her own behalf, stating that she was "clean" from drugs or alcohol since June 4, 2002. The mother also stated that she has resided with her boyfriend in a home for over a year that is "clean, quiet, and roomy." The mother admitted that she had not completed any of the services that were required by the petitioner within the applicable time frame and that she knew that failure to complete services might result in the loss of her children. However, the mother also testified that she had completed parenting class and structured learning therapy, albeit after the time period in question for the petition. According to the mother, her failure to attend meetings and appointments was frequently the result of the side effects of her diabetic condition. She also testified that she was diagnosed as depressed and bi-polar, but that she no longer needed or attended counseling. After acknowledging her addiction to cocaine, the mother averred that she did not need to complete a drug rehabilitation program since she was now free from drugs or alcohol. She testified that she left each of the drug rehabilitation programs of her own volition.
On cross-examination, the mother admitted that she had not completed any of the drug rehabilitation programs that she entered even though she chose each of the programs. She also admitted that she had been informed by her parent aide that she was not making progress in services. In response to the petitioner's question about why the police had been called to the mother's current address, the mother stated that her boyfriend, who does not speak English, did not understand that the petitioner was using his money to pay his bills.
In summation, the mother's attorney stated that the mother had made "some progress" in services and accused the petitioner of not providing an "intensive" drug rehabilitation program to the mother. In its summation, the petitioner reiterated that the mother had admitted she did not complete services within the applicable time period and that, to date, the mother has not completed a drug rehabilitation program. The petitioner stated that the mother had not made "substantial progress" in services to ensure the safety of her children. In his summation, the Law Guardian stated that the mother's continued refusal to complete a drug rehabilitation program presents a "significant [*9]barrier" to the safe return of the children.
Standard of Law
With respect to the substantive issue of law before this Court, Social Services Law §384-b (7) (a) defines, in part, that a permanently neglected child is

"...a child who is in the care of an authorized agency and whose parent...has failed for a period of more than one year following the date such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the agency's diligent efforts to encourage and strengthen the parental relationship..."
In a proceeding where parental rights are sought to be terminated based upon permanent neglect, a threshold inquiry must be made to determine whether the petitioner exercised diligent efforts to strengthen the parental relationship. Section 384-b (7) (f) of the Social Services Law defines diligent efforts as "reasonable attempts by an authorized agency to assist, develop and encourage a meaningful relationship between the parent and child..."
Findings of Fact and Conclusion of Law
Based upon the evidence before this Court, the Court finds the petitioner has demonstrated by clear and convincing evidence that the petitioner made diligent efforts to assist, develop, and encourage a meaningful relationship between the mother and her children.
The petitioner developed a service plan for the mother which included drug rehabilitation with mental health counseling, weekly visits with the children, parenting skills class, structured learning therapy class, a parent aide, an individual support person, and coordination of the individual elements of the service plan through the Alliance program. The petitioner reviewed and discussed services and her lack of progress with the mother on a regular basis. The petitioner kept the mother informed about the children's health and arranged for supervised and unsupervised visitation between the mother and the children. The Court finds there is no merit to the mother's contention that the petitioner should have provided her with an intensive drug rehabilitation program when the testimony of the caseworker showed that the mother consistently refused placement in an in-patient program until she was about to be arrested in an out-of-town incident concerning a vehicle and, at a later date, refused to enter a half-way house.
With respect to the petitioner's allegation that the mother failed to maintain contact with the children, this Court finds that the petitioner did not meet its evidentiary burden. Testimony showed that the mother had attended forty-six out of fifty-two visits with the children arranged by the agency during the subject period of the petition. Testimony also showed that the mother evidenced interest in the children during the visits.
This Court finds, however, that the petitioner has proven by clear and convincing evidence that the mother has failed for a period of more than one year following the time the children came into foster care to plan for the future of the children, although able to do so.
"Attendance at the myriad programs and visits arranged for the respondents clearly does not signal the necessary change, nor does the desire for return of the children." (Matter of Nathaniel T., 67 NY2d 838) The mother failed to complete a drug rehabilitation program or to progress in individual counseling. The mother failed to complete parenting classes or structured learning therapy in the applicable period of time. Although at times the mother appeared to make [*10]progress, she was unable to sustain the effort to correct the conditions that led to the children's removal from the home. The mother failed to modify her behaviors that put the children at risk, even displaying a reckless indifference to her own health. Based on the totality of the evidence and its observations of her demeanor while testifying, the Court does not find the mother's testimony believable when she claims that she has been drug-free and alcohol-free since June 4, 2002. Furthermore, the Court finds the mother's admission that she continues to drive even though her license has been suspended for driving while intoxicated deeply disturbing.
This Court finds that the mother has failed to progress or benefit from the services provided to her and, therefore, cannot safely and adequately provide for the needs of the children. (Matter of Katara F., 231 AD2d 844; Matter of Vincent M., 255 AD2d 515)
The mother also failed to secure stable and safe housing for herself and the children. Although the mother testified that she has resided at the same address for a year, during the applicable time period for the petition the mother had at least three different addresses and the caseworker's testimony was credible with respect to her difficulty in finding the mother at these alleged residences. There was also credible testimony from the caseworker that the mother told her that she was merely renting a room from the owner of her current address and that there was evidence that the mother was also staying with a friend who lived out of town in the same period of time.
The Court takes note of the mother's two unexcused absences from the fact-finding hearing. On the occasion of her first absence from Court, the mother's attorney was instructed to inform his client that a doctor's excuse was necessary. The mother never provided any such excuse to the Court. On the date of the mother's second absence from the fact-finding hearing, the mother's attorney stated that his client did not have enough money for local bus fare. This is an indication to the Court that the mother continues to be unable to manage her personal finances.
Accordingly, this Court concludes that the mother has permanently neglected the
subject children. A separate hearing will be conducted to determine what disposition is in the best interests of the children.
NOW, therefore, it is hereby
ADJUDGED, that the children were abandoned by the respondent-father; and it is further
ADJUDGED, that the petitioner has made adequate diligent efforts to develop and encourage a meaningful relationship between the respondent-mother and her children; and it is further
ADJUDGED, that the respondent-mother failed to plan for the future of the children for a period of more than one year following the date that the children came into the care of the petitioner; and it is further
ADJUDGED, that the children were permanently neglected by the respondent-mother; and it is further
ORDERED, that the parental rights of the respondent-father are terminated effective on the date of signature of the Decision and Order of Fact-Finding; and it is further
ORDERED, that a dispositional hearing with respect to the adjudication of permanent neglect shall be conducted as scheduled by the Court.